# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOHNNY LEE DOTSON,                                    Case No. 1:20-cv-405
     Plaintiff,                                      Litkovitz, M.J.


     vs.

COMMISSIONER OF                                       **ORDER**
SOCIAL SECURITY,
     Defendant.

Plaintiff Johnny Lee Dotson brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security ("Commissioner") denying

his application for disability insurance benefits ("DIB"). This matter is before the Court for

disposition based upon the parties' full consent (Doc. 6, 7) and on plaintiff's Statement of Errors

(Doc. 16), the Commissioner's response in opposition (Doc. 19), and plaintiff's reply (Doc. 22).

## I. Procedural Background

Plaintiff protectively filed his application for DIB in January 2017, alleging disability

since October 2, 2016, due to right shoulder pain; hip pain, possible hip replacement required;

and chronic obstructive pulmonary disease ("COPD"). The application was denied initially and

upon reconsideration. Plaintiff, through counsel, requested and was granted a *de novo* hearing

before administrative law judge ("ALJ") William Diggs, on February 11, 2019. Plaintiff and a

vocational expert ("VE") appeared and testified at the ALJ hearing. On March 7, 2019, the ALJ

issued a decision denying plaintiff's DIB application. This decision became the final decision of

the Commissioner when the Appeals Council denied review on April 9, 2020.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).  The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)).  The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548

(6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

### B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through December 31, 2019.

> 2. The [plaintiff] has not engaged in substantial gainful activity since October 2, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

> 3. The [plaintiff] has the following severe impairments: osteoarthrosis and chronic obstructive pulmonary disease (20 CFR 404.1520(c)).

> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

> 5. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he is further limited to occasionally stooping, crouching, and climbing ramps and stairs; frequently balancing and kneeling; never crawling or climbing ladders, ropes, or scaffolds; avoiding more than frequent exposure to fumes, odors, dusts, gases, and poor ventilation; and avoiding all exposure to workplace hazards such as dangerous machinery and unprotected heights.

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565).[1]

7. The [plaintiff] was born [in] . . . 1970 and was 45 years old, which is defined as a younger individual age 45-49, on the alleged disability onset date (20 CFR 404.1563).

8. The [plaintiff] has a limited education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the [plaintiff] is "not disabled," whether or not the [plaintiff] has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569 and 404.1569(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from October 2, 2016, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 30-35).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

---

[1] Plaintiff's past relevant work was as an auto body repairer and an auto body painter, both of which are medium, skilled positions. (Tr. 34, 65).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative sedentary, unskilled occupations such as a charge accounts clerk (60,000 jobs in the national economy); an order clerk (70,000 jobs in the national economy); and an inspector (70,000 jobs in the national economy). (Tr. 35, 67-68).

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. The medical evidence

Plaintiff was treated by Dr. Brian Crellin, D.O., beginning in June 2015 for right shoulder pain. (Tr. 278-83). Plaintiff reported radiating pain that he rated as 6/10 on the analog pain scale. (Tr. 279). Plaintiff informed Dr. Crellin that he painted cars for a living and was having

difficulty holding his arm up due to pain. (*Id*.). Prior treatments for the pain included a home exercise program (HEP), Tylenol, rest, pain patches, and topical ointment. (*Id*.). X-rays showed degenerative joint disease of the "a.c. (acromioclavicular) joint" and a superior humeral head avascular necrosis (AVN)[3] "encompassing approximately 5-10%." (Tr. 282). The impression was primary localized osteoarthrosis of the shoulder region and AVN of the humeral head. (*Id*.). A joint injection was administered at that visit, and Dr. Crellin recommended that plaintiff be followed to determine whether the injection helped, with follow-up to include an MRI to determine the extent of the AVN if an injection did not help.

At plaintiff's next visit in July 2015, plaintiff reported that his symptoms were "50% better" after the injection. (Tr. 275). He rated as pain level as 5/10. (*Id*.). Dr. Crellin diagnosed right shoulder a.c. joint degenerative disc disease; right shoulder impingement syndrome, rule out rotator cuff tear; and right humeral head AVN. (*Id*.). Dr. Crellin recommended that an MRI be performed, noting that plaintiff had "gone through extensive nonoperative treatment with ice, home therapy program, steroid injection, modified activities [and] NSAIDs." (Tr. 277). In August 2015, plaintiff rated his pain as 7/10. (Tr. 272). MRI results showed "severe glenohumeral degenerative changes with AVN superior humeral head and degenerative laberal tearing with extensive subchondral cysts." (Tr. 273). The plan was to administer an intra-articular steroid injection, try a prescription level "MOBIC" (a NSAID), and continue the use of heat and ice. (Tr. 274). In November of 2015, plaintiff was "doing worse" and continued to struggle with pain and dysfunction. (Tr. 270). Dr. Crellin noted he had "severe" arthritis and

---

[3] "Avascular necrosis is the death of bone tissue due to a lack of blood supply." *See* https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859 (last visited July 15, 2021).

stable AVN. (Tr. 270). He also noted that plaintiff had tried "extensive" nonoperative treatment, including anti-inflammatories and steroid injections, and Dr. Crellin did not think plaintiff would obtain significant relief from therapy. (*Id*.). Dr. Crellin referred plaintiff to his shoulder specialist partner, Dr. Andrew Shafik Islam, M.D., to see if Dr. Crellin had missed anything and to learn if other therapies could be offered to plaintiff. (Tr. 271).

Plaintiff consulted with Dr. Islam, an orthopedic surgeon, in November 2015. (Tr. 428-32). Plaintiff reported a multiyear history of achy right shoulder pain that was worse with activity, including overhead activities, and that also occurred at night. (Tr. 428). Dr. Islam interpreted MRI results as showing evidence of AVN within the humeral head as evidenced by "numerous cuts consistent with a large lesion" and "degenerative changes within the glenoid." (Tr. 431). The assessment was AVN of the right shoulder (new). (*Id*.). Dr. Islam agreed with Dr. Crellin's recommendation that plaintiff receive a steroid injection. (Tr. 431).

On follow-up with Dr. Crellin for his shoulder pain in December 2016, plaintiff reported his pain level was 8/10. (Tr. 263). Plaintiff was interested in pain management and right shoulder replacement surgery, which plaintiff had to postpone "due to some current lifestyle changes." (*Id*.). Dr. Crellin noted prior treatment had included steroid injections, anti-inflammatories, ice/heat, and modified activity. (*Id*.). X-rays showed the AVN remained stable with moderate to severe cystic changes to the glenoid. (*Id*.). Dr. Crellin assessed right shoulder pain of unspecified chronicity, AVN of the right humeral head, and right glenohumeral arthritis. (Tr. 265). A steroid injection was administered in plaintiff's right shoulder, medications were

prescribed, and Dr. Crellin referred plaintiff to pain management "until he is ready to get his shoulder replaced." (*Id*.).

Plaintiff was also treated for bilateral hip pain during this same time period. Dr. Crellin noted in his December 2016 report that plaintiff had recently been diagnosed with AVN of the bilateral hips by his primary care physician, Dr. Paula Ackerman, D.O. (Tr. 265). In August 2016, plaintiff complained to Dr. Ackerman of low back pain that had begun approximately two months earlier. (Tr. 532). Plaintiff reported the pain level was 9/10. (Tr. 533). Dr. Ackerman assessed sacroiliac pain and bilateral low back pain without sciatica; she prescribed oral steroids and a muscle relaxant; and she recommended a home exercise program trial. (Tr. 532-37). An MRI of plaintiff's pelvis performed in September 2016 showed chronic appearing extensive AVN of the hips, left greater than the right; minimal narrow edema in each femoral neck; and small left hip joint effusions. (Tr. 368). After plaintiff did not show for an appointment on September 8, 2016, Dr. Ackerman called plaintiff due to a concern of AVN as shown on the imaging results and the need for further follow-up. (Tr. 553-54).

Plaintiff saw orthopedist Dr. Marc Wahlquist, M.D., in October 2016 on referral by Dr. Ackerman for left hip pain and back pain of five months' duration. (Tr. 590-97). Plaintiff rated the pain as 6/10, he complained that the pain was worse on the left, and he reported it "[h]urts all the time but [is] worse with walking." (Tr. 590-91). Imaging results showed bilateral hip AVN with fragmentation of the articular surface. (Tr. 594). Dr. Wahlquist diagnosed plaintiff with bilateral hip pain and AVN of both hips. (*Id*.). Treatment options discussed were "cane, time,

nsaids, injections and THA (total hip arthroplasty)." (Tr. 595). Plaintiff did not want to pursue any treatment options at that time, but Dr. Wahlquist recommended "at least a cane in the opposite hand of whatever hip is hurting that day," and he recommended that plaintiff see another physician when he was "ready to proceed with THA for [a] possible bilateral procedure." (*Id*.).

In January 2017, plaintiff consulted with pain management specialist Dr. Gururau Sudarshan, M.D., on referral from Dr. Crellin with complaints of constant and throbbing pain in his right shoulder and secondary complaints of pain in both hips. (Tr. 223-29). Plaintiff had been administered numerous steroid injections in his right shoulder and had been prescribed Tramadol, which he reported was "not really helpful at all." (Tr. 223). Plaintiff reported his pain was relieved by narcotic medications and heat, and he rated it as 6/10. (*Id*.). Plaintiff reported his pain was aggravated by lifting, bending, twisting, pushing, and pulling. (*Id*.). He reported that his shoulder pain moderately limited his activities. (*Id*.). It was exacerbated by exertion, lifting, pulling, changing positions, extension, forward elevation, abduction/external rotation, and internal rotation. (*Id*.). His condition, which had been treated to date with "high dose opioids," showed no long-term improvement as to either pain or function. (Tr. 228). He was assessed as a "complex patient to handle" from a pain management perspective because he had developed a tolerance to opioids and suffered from the original pain condition and "significant side effects," including opioid induced constipation and opioid hyperalgesia. (*Id*.). The plan was to try to decrease plaintiff's opioid dependency, try non-opioid medications even

though their efficacy had been hampered by the use of high dose opioids, and try local topical treatments. (*Id.*). There is also a notation to "[c]onsider [the] left hip." (*Id.*).

When seen two weeks later, plaintiff reported right shoulder and bilateral hip pain. (Tr. 230). He rated his right shoulder pain as 7/10. (*Id.*). Physical examination findings were essentially normal except for tenderness at the lumbar spine and facet joint and a positive straight leg raise on the right. (Tr. 231-33). Dr. Sudarshan assessed plaintiff with a moderate to severe chronic pain condition that was controlled with "stable doses of opioids," and he opined that plaintiff had "shown [a] response to opioids with a decrease in the pain level." (Tr. 236). He reported that plaintiff "has had an extensive trial with non-opioid medications, conservative and interventional treatment options and continues to complain of moderate to severe pain." (*Id.*). He reported that plaintiff's opioid dose had not been increased for several months and no clinical side effects were noted based on the examination. (*Id.*). He added a pain cream and a TENs unit to plaintiff's treatment plan. (*Id.*). In February 2017, plaintiff complained of right shoulder and right hip pain. (Tr. 238). He reported his pain was 9/10 and noted his Tramadol was "not very helpful at all." (*Id.*). A left hip injection was scheduled. (Tr. 244).

When seen at Cincinnati Pain Physicians in March 2017, plaintiff reported a recent right hip injection and his last few right shoulder injections, which had been helpful in the past, provided no relief. (Tr. 339). He complained that standing and walking caused pain in the groin, he could not sleep due to the pain, and he could not have surgery because he was going through a divorce and had no one to care for him after the surgery. (Tr. 339). On examination, he exhibited decreased range of motion of both hips. (Tr. 338). Plaintiff opted to hold off on

surgery and continue pain management, his opioid prescription was changed, and voltaren gel was added to his medications. (Tr. 337, 340).

In April 2017, plaintiff reported to Dr. Wahlquist that his right hip pain had increased since he had received a cortisone injection at Cincinnati Pain Management. (Tr. 605-10). He complained of increased difficulty with prolonged walking/standing and using stairs and difficulty sleeping due to pain. (Tr. 605). Plaintiff had obtained some relief from injections for AVN in his shoulders, which Dr. Crellin continued to treat. (*Id.*). Plaintiff rated his current pain level as 6/10. His gait was antalgic with tenderness of the hips and reduced range of motion with pain. (Tr. 609). Dr. Wahlquist referred plaintiff to Dr. Sorger for a surgical THA evaluation and opined that plaintiff "may be a good candidate for the arthrosurface joint replacement system" for the shoulder. (Tr. 610).

Orthopedic surgeon Dr. Joel Sorger, M.D., evaluated plaintiff on May 9, 2017. (Tr. 390-93). Plaintiff reported moderate to severe bilateral hip pain that was worse with activity and mildly better with rest and pain in the right shoulder joint. (Tr. 390). On examination, plaintiff had reduced strength and range of motion of the hips, pain in the groin with motion, and an antalgic gait. (Tr. 392). Dr. Sorger diagnosed plaintiff with bilateral hip pain and AVN of the left hip. (Tr. 393). Plaintiff consented to undergo a total hip arthroplasty. (*Id.*).

Dr. Sorger performed a total left hip arthroplasty on June 19, 2017. (Tr. 485-86). Dr. Sorger saw plaintiff for follow-up on September 14, 2017. (Tr. 395-96). Plaintiff reported intermittent pain over the lateral aspect of the left hip. (Tr. 395). He had returned to work but had "weakness within his left leg." (*Id.*). Plaintiff had completed one month of physical therapy.

(*Id.*). On physical examination, the incision was well-healed with no signs of erythema or infection, the hip was stable, and sensation was intact. (Tr. 396). Plaintiff had mild pain to palpation laterally over the hip and reduced strength on flexion. (*Id.*). Imaging results showed the implant was "in good position" and "well aligned with no evidence of loosening." (Tr. 402). Treatment options were discussed regarding plaintiff's "ongoing pain," including "getting him back into physical therapy to help work on his strength." (*Id.*). Plaintiff indicated he "would like to give it some time to see if it gets better on its own." (*Id.*). The plan was to "discuss possible hip replacement on the right side [during] his next visit in 3 months with a new x-ray." (*Id.*).

Plaintiff consulted with Dr. Wahlquist by telephone in August 2018 and saw Dr. Wahlquist in September 2018 for bilateral hip follow-up. (Tr. 622-27, 615-20). Plaintiff reported he was still having pain and discomfort since his surgery and his pain "has never improved since his surgery." (Tr. 615, 622). Plaintiff reported pain that radiated down the side of his left hip to the inside of his left thigh; his pain was worse in the morning and was aggravated when he tried to get out of bed; he had numbness and tingling radiating down to his thigh; and he walked and performed stretching exercises and but did not perform a recommended home exercise program. (*Id.*). He rated his current pain level as 7/10. (*Id.*). X-rays showed a "[w]ell positioned implant in left hip without si[]gns of loosening and sclerosis of right femoral head consistent with abduction." (Tr. 619, 626). When seen in September 2018, plaintiff ambulated with a limp but did not use a cane. (Tr. 626). The left hip was well-healed but examination showed diffuse tenderness over the groin, decreased sensation at the lateral thigh, and "good" hip range of motion but "weak" hip flexion, abduction, and adduction. (*Id.*). The

right hip showed good range of motion but weak hip flexion, abduction, and adduction. (*Id*.).

Dr. Walhquist opined:

> Given his poor outcome with his left THA I am reluctant to recommend right THA. I think some of his symptoms are related more to hip weakness at this time. I am recommending PT for him. He isn't using a cane today and I advised him to get one to unload his hip a little bit.

(Tr. 627).

Plaintiff also consulted with Dr. Islam in August 2018 for evaluation of bilateral shoulder pain, greater on the right than the left, on referral from Dr. Crellin for possible shoulder replacement surgery. (Tr. 411-15). Dr. Islam noted plaintiff had been treated with anti-inflammatories, physical therapy, and injections. (Tr. 411). However, plaintiff had not obtained any significant relief of his symptoms and his pain had been "progressively worsening" and "had become quite severe." (*Id*.). X-rays of both shoulders showed evidence of some degenerative changes consistent with AVN of both shoulders. (Tr. 414). Dr. Islam diagnosed plaintiff with a tear of the right rotator cuff. (*Id*.). He discussed treatment options with plaintiff, including shoulder surgery after imaging results were obtained, and referral to pain management. (*Id*.). Plaintiff wanted to wait on surgery and Dr. Islam deferred to pain management for possible nerve ablation before considering surgery. (Tr. 417-18).

A CT scan of the right shoulder performed in September 2018 disclosed AVN of the humeral head, moderate osteoarthritis of the glenohumeral joint[4], severe osteoarthritis of the acromioclavicular joint, and a small SLAP (superior labrum, anterior-posterior[5]) tear. (Tr. 633-

---

[4] Next to this impression is a handwritten notation that reads, "looks severe on my review."

[5] *See* https://medical-dictionary.thefreedictionary.com/SLAP+tear.

34).  Dr. Islam reviewed the CT scan in September 2018 and reported that it showed an intact rotator cuff, severe arthritis in the AC joint, and severe osteoarthritis of the glenohumeral joint. (Tr. 417-18).  Dr. Islam diagnosed AVN of the right humeral head; right glenohumeral arthritis; superior glenoid labrum lesion of right shoulder, initial encounter; and arthrosis of the right acromioclavicular joint.  (Tr. 417).  Dr. Islam recommended a potential total shoulder replacement with distal clavicle resection; however, he deferred to the recommendation of plaintiff's pain management physician that a nerve ablation first be performed and surgical intervention be considered only if that procedure was unsuccessful.  (Tr. 418).

Plaintiff attended physical therapy between September 17, 2018 and October 4, 2018 at Summit Physical Therapy.  (Tr. 298-310).  At his initial evaluation, plaintiff reported that he had four to five weeks of home care after his surgery in June of 2017 but did not have any further physical therapy on an outpatient basis because he did not see significant improvement in his symptoms since his surgery.  (Tr. 309).  Plaintiff complained of significant pain which he rated as 10/10 at its worst with "very short periods in which he does not have significant pain." (*Id*.). He complained of hip pain "particularly with movement and activity" and his score on the "Lower Extremity Functional Scale" was low.  (*Id*.).  Plaintiff reported that he had been told the source of his continued symptoms was unclear because x-rays "show proper healing and alignment." (*Id*.).  The evaluation noted that plaintiff "has right AVN and it has been recommended that he undergo total hip replacement for this side as well but he is reluctant due to lack of improvement with the left hip." (*Id*.).  Plaintiff had a "moderate antalgic gait" and bilateral hip range of motion was restricted with pain.  (*Id*.).  Bilateral strength was reduced to

4/5 on flexion and 3/5 on abduction. (*Id*.). Plaintiff was assessed as "[s]tatus post left total hip replacement with continued complaints of pain and functional limitations" and as showing "significant weakness that may benefit from a formal physical therapy program to improve strength, gait and function." (*Id*.). The short terms goals established were to initiate a home exercise program; improve his sit-to-stand ability; show improvement in plaintiff's ability to sleep; and show ability in plaintiff's ability to put his shoes and socks on. (Tr. 310). The long term plan was to show improvement in the ability to go up and down steps; show significant improvement in tolerance to standing and walking; gain the ability to single-leg balance for 15 seconds; and have no restrictions in getting in and out of a car and up/down from lower surfaces. (*Id*.). The recommendation was that plaintiff be seen approximately twice a week for approximately 8 to 10 weeks to improve range of motion, flexibility, and strength. (*Id*.).

On September 20 and 27, 2018, plaintiff reported his overall condition was unchanged. (Tr. 304, 306). He reported difficulty in prolonged standing and walking. (*Id.*). He had no new complaints since his initial evaluation but reported he had been "sore lately," which he attributed to performing the exercises. (*Id.*). On October 1, 2018, plaintiff reported increased hip pain after mowing his lawn. (Tr. 302). Plaintiff reported continued difficulty with prolonged walking and standing and difficulty with "daily activities/yard work." (*Id*.). On October 4, plaintiff reported that he had "been more active lately and this may have caused some increase in left anterior thigh symptoms," and he was "very sore the day following therapy but feels that he may be some improved overall." (Tr. 300). Plaintiff reported difficulty with standing, walking, and dressing/personal care. (*Id*.). Plaintiff was discharged from physical therapy on November 6,

2018, when he "no-showed" his next two scheduled appointments and did not call to reschedule. (Tr. 299). Plaintiff had met his short-term goal of initiating a home exercise program, but the physical therapist was unable to reassess whether plaintiff had met his goals in any other areas. (*Id.*). The physical therapist assessed his rehabilitation potential and prognosis as "good." (*Id.*).

Plaintiff began treating with pain management specialist Dr. Vishal Patel, M.D., at Premier Pain Treatment Institute beginning in September 2018. (Tr. 311-12). Plaintiff complained of shoulder pain and of bilateral hip pain that he rated as 5/10. (Tr. 311). Plaintiff reported that he obtained moderate relief with his current pain regimen and that "higher norco dosing has been helping him significantly." (Tr. 312). Plaintiff had not attended physical therapy recently but he continued to do home exercises. (Tr. 313). The plan was to treat plaintiff's right hip with medication and consider a nerve block in the future if plaintiff was open to that. (Tr. 315). Dr Patel noted: "Patient is surgical candidate but wants to hold off after continued pain with left hip replacement" (*Id.*). In October 2018, plaintiff reported that pain medications were helping but there were "patches where he doesn't get relief." (Tr. 317). He rated his pain as 7/10. (*Id.*). The functional assessment noted mild joint swelling, it was "[v]ery painful" to go up or down stairs," and plaintiff could "[m]ostly walk without support or assistance." (*Id.*).

In November 2018, Dr. Patel noted that plaintiff's "orthopedic surgeons states (sic) that he could have right shoulder and right hip replacement but do not recommend it because of continued pain after left hip replacement." (Tr. 313). Plaintiff rated his pain as 5/10 at that visit. (Tr. 312). Plaintiff was functionally assessed with mild joint stiffness and swelling; going up or

down stairs was moderately painful; walking on flat surfaces was mildly painful; and putting on or taking off socks was slightly difficult. (*Id.*). Dr. Patel noted that plaintiff "is [a] surgical candidate but wants to hold off after continued pain with left hip replacement." (Tr. 315). Dr. Patel continued to prescribe medications and suggested that a nerve block be considered in the future. (*Id.*).

### E. Specific errors

On appeal, plaintiff alleges two assignments of error: (1) the ALJ erred by failing to properly evaluate plaintiff's subjective complaints and, in turn, plaintiff's functional limitations; and (2) the ALJ and the Appeals Council erred by failing to give proper weight to the opinion of plaintiff's treating orthopedist, Dr. Andrew Shafik Islam, M.D. (Docs. 16, 22).

#### 1. Consideration of Dr. Islam's RFC assessment (Second assignment of error)

Plaintiff alleges that the ALJ and Appeals Council erred by failing to consider and give appropriate weight to the physical RFC assessment completed by Dr. Islam almost four weeks after the ALJ hearing. (Doc. 16 at PAGEID 710; *see* Tr. 11-18). The ALJ originally granted plaintiff an extension of time until February 25, 2019 to submit Dr. Islam's assessment (Tr. 54), which the ALJ later extended to March 13, 2019 (Tr. 40). The ALJ asked counsel that if plaintiff decided not to submit any additional evidence, "please advise this office immediately to avoid further delay in deciding your case." (Tr. 40). Plaintiff subsequently advised the ALJ's office by telephone that Dr. Islam would *not* be completing an assessment. (Tr. 10). However, Dr. Islam did complete an assessment dated March 7, 2019. (Tr. 11-18). Plaintiff submitted the assessment to the ALJ with a letter that was also dated March 7, 2019. (*Id.*). The ALJ issued his

written decision that same date.  (*Id.*).  Plaintiff acknowledges that the ALJ issued his decision before the revised deadline for submitting new evidence expired based upon plaintiff's "counsel's communication to the ALJ that Dr. Islam would *not* be executing the form."  (Doc. 16 at PAGEID 710) (emphasis added).   Plaintiff nonetheless suggests that the ALJ erred by failing to consider the assessment because plaintiff submitted the assessment before the extended deadline for submitting additional evidence expired; a treating physician's statement "would be important for any decision-maker"; and the Appeals Council erred by finding the completed form would not change the outcome of the ALJ's decision "when the limitations stated in the form are clearly disabling."   (*Id.*; Doc. 22 at PAGEID 770-71).

Defendant argues that Dr. Islam's assessment cannot be considered in determining whether a remand is appropriate under sentence four of 42 U.S.C. § 405(g) because the opinion was not before the ALJ when he issued his decision.  (Doc. 19 at PAGEID 757).  Defendant contends that the Appeals Council's decision is not reviewable.  (*Id*. at PAGEID 758).  Defendant argues that evidence submitted for the first time to the Appeals Council can be considered only to determine whether remand is appropriate under sentence six of § 405(g), and plaintiff has waived this argument by failing to raise it in his statement of errors.  (*Id*.).  Defendant argues that even if plaintiff did not waive a sentence six argument, the argument would be futile because the standard for consideration of new evidence under sentence six is not met here.  (*Id*.).

Plaintiff has not shown that the ALJ erred by failing to consider Dr. Islam's assessment. The ALJ granted plaintiff an extension of time until March 13, 2019 to submit additional

evidence. (Tr. 40). The ALJ directed counsel to advise his office immediately if plaintiff decided not to submit any additional evidence. (*Id*.). Plaintiff's counsel admittedly informed the ALJ on March 7, 2019 that Dr. Islam would not be submitting an assessment (Tr. 10), and the ALJ issued his decision on that same date based on counsel's communication (Doc. 16 at PAGEID 710). Plaintiff has not cited any authority to show the ALJ erred by relying on counsel's representation that an assessment would not be forthcoming to issue a decision prior to expiration of the revised deadline based on that representation.

Further, plaintiff cannot challenge the Appeals Council's decision in connection with his request for reversal and remand of the ALJ's decision under sentence four. When the Appeals Council declines review, as it did in this case, it is the decision of the ALJ that is subject to appellate review. *Cotton v. Sullivan*, 2 F.3d 692, 695-96 (6th Cir. 1993). The Court may not consider evidence presented for the first time to the Appeals Council in deciding whether to uphold, modify, or reverse the ALJ's decision. *Id*. at 696. *See also Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). Accordingly, the Court may not consider Dr. Islam's assessment in deciding whether to uphold, modify, or reverse the ALJ's decision under sentence four.

Further, although the court may remand a case for further administrative proceedings under sentence six of § 405(g) "if a claimant shows that the evidence is new and material, and that there was good cause for not presenting it in the prior proceeding," plaintiff has waived a sentence six argument in this case.[6] *Cline*, 96 F.3d at 148. Plaintiff cannot pursue a remand

_____

[6] Sentence six provides that the district court "may at any time order additional evidence to be taken before the Commissioner . . . , but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ." 42 U.S.C. § 405(g).

under sentence six because he failed to raise this argument in his statement of errors.  The Sixth

Circuit "has consistently held that arguments not raised in a party's opening brief, as well as

arguments adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw County,*

709 F.3d 612, 624 (6th Cir. 2013) (citing *Caudill v. Hollan,* 431 F.3d 900, 915 n. 13 (6th Cir.

2005)).  *See also Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (a

plaintiff's failure to develop an argument challenging an ALJ's non-disability determination

amounts to a waiver of that argument).  Plaintiff did not raise an argument that Dr. Islam's

assessment is "new" and "material" evidence that warrants remand under sentence six.  Plaintiff

has therefore waived this argument.

Plaintiff's second assignment of error is overruled.

## 2.  The ALJ's evaluation of plaintiff's subjective statements (First assignment of error)

Title 20 C.F.R. § 404.1529 and Social Security Ruling 16-3p, 2016 WL 1119029, *3

(March 16, 2016) describe a two-part process for evaluating an individual's subjective statements

about symptoms, including pain.[7]  First, the ALJ must determine whether a claimant has a

medically determinable physical or mental impairment that can reasonably be expected to

produce the symptoms alleged; second, the ALJ must evaluate the intensity, persistence, and

functional limitations of those symptoms by considering objective medical evidence and other

---

*See also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010) (to obtain a remand, the claimant must show that the evidence is "new" and "material" and that there was good cause for failure to present the evidence at the hearing).

[7] SSR 16-3p, 2016 WL 1119029, which "provides guidance about how [the SSA] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms," superseded SSR 96-7p and became applicable to decisions issued on or after March 28, 2016.  *See* SSR 16-3p, 2017 WL 5180304 (October 25, 2017) (clarifying applicable date of SSR 16-3p).

evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. *See also* 20 C.F.R. § 404.1529(c)(3). The ALJ's assessment of a claimant's subjective complaints and limitations must be supported by substantial evidence and be based on a consideration of the entire record. *Rogers*, 486 F.3d at 247 (internal quotation omitted). The ALJ's explanation of his decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at 248.

The ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the medical and other evidence in the record. (Tr. 32). The ALJ cited three primary reasons for finding that though there was objective imaging evidence "supporting significant bilateral [] shoulder and right hip conditions," the extent of plaintiff's alleged limitations was not supported by the remaining evidence. (Tr. 33). First, the ALJ found that "replacement was no longer recommended for the right shoulder and hip due to ongoing complaints of left hip pain despite what was an apparently successful left hip replacement." (*Id.*). Second, the ALJ found that plaintiff was "non-compliant with physical therapy and home therapy, instead, preferring to

pursue helpful opioid therapy," which suggested his symptoms were not as severe as alleged. (*Id*.). Third, the ALJ found that "while the September and October 2018 therapy notes show increased pain with activity, these records also show that [plaintiff] was able to mow his yard on a riding mower." (*Id*.). The ALJ concluded based on these findings that "the evidence suggests an ongoing ability to perform sedentary exertional activity." (*Id*.). In addition, the ALJ found that "despite diagnoses of COPD, [plaintiff] continued to smoke, and there are no hospitalizations or suggestions of exacerbation despite only conservative inhaler therapy." (*Id*.).

Plaintiff alleges that the ALJ erred by finding that the intensity, persistence, and functional limitations of his symptoms was not entirely consistent with the medical and other evidence of record. (*Id*. at PAGEID 707-08). Plaintiff contends that the ALJ's conclusion is not supported by the record because either (1) the alleged inconsistencies the ALJ cited do not exist; or (2) the ALJ did not consider the alleged inconsistencies in the context of evidence showing plaintiff received extensive treatment over a period of years for a progressive disease that resulted in pain, functional limitations, and surgery to replace his left hip. (*Id*. at PAGEID 708). Plaintiff identifies several flaws in the ALJ's reasoning.

First, plaintiff alleges that the ALJ erroneously discounted his complaints by finding that "replacement was no longer recommended for the right shoulder and hip due to ongoing complaints of left hip pain despite what was apparently a successful left hip replacement." (Doc. 16 at PAGEID 708, citing Tr. 33). Plaintiff contends that the ALJ's statement apparently refers to Dr. Patel's treatment note dated November 20, 2018, which states: "His orthopedic surgeons states [sic] that he could have right shoulder and right hip replacement but do not recommend it

because of continued pain after left hip replacement." (*See* Tr. 313). Plaintiff alleges that this treatment note is not inconsistent with his reports of pain and functional limitations but instead supports his subjective complaints. (Doc. 16 at PAGEID 708).

The ALJ did not reasonably rely on the treating providers' recommendations against further surgery to find that plaintiff's subjective statements were inconsistent with the evidence of record. According to their treatment notes, plaintiff's treating physicians recommended that he not undergo additional surgery for more than one year following his total left hip replacement surgery in June 2017 because although the left his implant appeared to be stable and well-positioned, plaintiff continued to complain of ongoing bilateral hip pain and other symptoms following the surgery. Surgical follow-up notes from Dr. Sorger's office dated September 2017 note that x-rays showed the left hip implant was "in good position" and was "well aligned with no evidence of loosening"; however, plaintiff continued to suffer from ongoing pain and weakness. (Tr. 402). Various treatment options were discussed to address plaintiff's ongoing pain, including physical therapy for strengthening. (*Id.*). Plaintiff opted to "give it some time" to see if the left hip pain improved "on its own." (*Id.*). The plan was to discuss a possible right hip replacement in three months after a new x-ray was obtained. (*Id.*). Dr. Sorger did not characterize plaintiff's left hip replacement as "successful," and he did not recommend against additional surgery in the future based on plaintiff's current complaints of pain following his left hip surgery.

Similarly, contrary to the ALJ's finding, Dr. Wahlquist did not recommend against further hip surgery based on plaintiff's continued complaints of pain following a "successful"

23

left hip surgery. To the contrary, Dr. Walhquist was "reluctant to recommend" right hip replacement in September of 2018 due to what he characterized as a "*poor outcome*" with plaintiff's left hip replacement. (Tr. 627) (emphasis added). The left hip was well-healed but examination showed diffuse tenderness over the groin, decreased sensation in the lateral thigh, and "good" bilateral hip range of motion but "weak" hip flexion, abduction, and adduction. (Tr. 626). Plaintiff ambulated with a limp but did not use a cane. (*Id*.). Dr. Wahlquist recommended physical therapy to increase plaintiff's hip strength due to weakness, which he thought was the cause of some of plaintiff's symptoms, and he advised plaintiff to get a cane. (Tr. 627).

Further, there is no indication that any of plaintiff's treating providers recommended against shoulder surgery based on plaintiff's continued complaints of pain despite "successful" left hip surgery. To the contrary, shoulder surgery was recommended for plaintiff and the decision to not proceed with surgery was made only after exploring alternative treatments. When plaintiff was seen by Dr. Islam on referral from Dr. Crellin in August 2018 for evaluation of bilateral shoulder pain, Dr. Islam opined that plaintiff was a candidate for right shoulder replacement surgery. (Tr. 411-18). Dr. Islam reported that plaintiff complained of "progressively worsening" pain that had become "quite severe." (Tr. 411). The following month, Dr. Islam reported that plaintiff had failed treatment with anti-inflammatories, physical therapy, and injections. (Tr. 416). After reviewing the CT results, Dr. Islam recommended "total shoulder replacement along with distal clavicle resection at the same time." (Tr. 418). However, Dr. Islam concurred with the recommendation of plaintiff's pain management

physician and with plaintiff's decision to "try[] nerve ablation before proceeding with any surgery," which Dr. Islam thought was a reasonable plan. (*Id*.).

No other treating physician recommended against additional surgery because plaintiff continued to complain of pain following a "successful" left hip replacement. Dr. Patel, plaintiff's pain management physician, noted in November of 2018 that plaintiff was a "surgical candidate but wants to hold off after continued pain with left hip replacement." (Tr. 315). Dr. Patel also noted that plaintiff's orthopedic surgeons recommended against right shoulder and right hip replacement because plaintiff suffered from "continued pain after left hip replacement." (Tr. 313). Dr. Patel suggested instead that a nerve block be considered in the future, and the plan was to wean plaintiff off opioids as tolerated. (Tr. 315). Dr. Patel, who was not an orthopedist or a surgeon, did not render an opinion as to whether plaintiff's left hip surgery was successful and whether plaintiff should undergo additional surgery.

Thus, the ALJ appears to have misconstrued the record insofar as he found that further surgery was not recommended for plaintiff due to his continued complaints of pain following a "successful" left hip replacement. (Tr. 33). No treating physician characterized plaintiff's left hip surgery as "successful" or questioned whether further surgery should be considered to address plaintiff's continued complaints of pain and other symptoms. To the contrary, Dr. Wahlquist was "reluctant" to recommend additional surgery because the outcome of the left hip surgery was "poor." (Tr. 620). In addition, though he ultimately concurred with a recommendation by plaintiff's pain management physician that a nerve ablation be attempted first, Dr. Islam recommended that plaintiff undergo a total shoulder replacement. (Tr. 418).

There is no indication that Dr. Islam factored the success of plaintiff's left hip surgery into his decision or that he believed surgery was not warranted because plaintiff had continued complaints of pain and other symptoms. Pain management physician Dr. Patel reported the recommendations of plaintiff's treating orthopedists, but he did not make his own recommendation as to whether additional surgery was warranted. Evidence showing that plaintiff continued to suffer from bilateral hip and shoulder pain and symptoms following his left hip surgery, and that surgery to treat his symptoms was an option his treating physicians continued to explore, does not support the ALJ's decision to discount plaintiff's subjective statements.

Plaintiff alleges that the ALJ also improperly found that his symptoms were not as severe as alleged because plaintiff was "non-compliant with physical therapy and home therapy, instead, preferring to pursue helpful opioid therapy." (Doc. 16 at PAGEID 709, citing Tr. 33). Plaintiff alleges that in making this finding, the ALJ failed to consider plaintiff's full treatment history and the reasons for his treatment choices.

In evaluating whether an individual's symptoms affect his ability to perform work-related activities, the ALJ may "consider an individual's attempts to seek medical treatment for symptoms and to follow treatment once it is prescribed. . . ." SSR 16-3p, 2016 WL 1119029, at *8. "Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." *Id.* However, "if the frequency or extent of the treatment

sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." *Id.* Before finding a claimant's symptoms are inconsistent with the evidence based on failure to seek treatment or failure to follow prescribed treatment, the ALJ must first consider the "possible reasons [the claimant] may not comply with treatment or seek treatment consistent with the degree of his . . . complaints." *Id. See also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 506-07 (6th Cir. 2013) (analyzing former SSR 96-7p) (an ALJ can discount allegations of debilitating pain based on a conservative course of treatment, unless the claimant has a good reason for failing to seek more aggressive treatment).

The Sixth Circuit in *Johnson* expressed concern over the ALJ's failure to explore the reasons the plaintiff had not proceeded with surgery and had participated in physical therapy for only a limited time period. *Id.* at 507. The Court explained:

> In general, it is appropriate for the ALJ to consider a claimant's treatment (other than medication) in evaluating his or her symptoms and pain, *see* 20 C.F.R. § 404.1529(c)(3)(v), and a claimant must follow *prescribed* treatment in order to obtain benefits absent good reason. *See* 20 C.F.R. § 404.1530. The record, however, indicates that these were only recommended treatment options. [The] [n]eurosurgeon . . . opined that Johnson's surgical outcome "would be suboptimal" and that surgical intervention might not be the best choice. Moreover, Social Security Ruling 96-7p strongly suggests that a claimant should be allowed to explain his or her reasons for not pursuing certain treatment options. . . .

*Id.* at 507 (citation omitted). The Court concluded that although the ALJ's error was harmless, the "better course" would have been to allow the claimant "the opportunity to explain his

choices." *Id*.

Here, the ALJ stated that he would expect plaintiff to "follow through with treatment directives" if his conditions were as severe as plaintiff alleged. (Tr. 33). The ALJ found that plaintiff "was non-compliant with physical therapy and home therapy" according to treatment notes. (Tr. 33). However, the evidence does not show that plaintiff failed to comply with prescribed treatment or treatment directives. The record indicates that physical therapy and home exercise were two of several treatment options that plaintiff's treating providers discussed with him and that plaintiff pursued at various times. For instance, Dr. Sorger discussed "treatment options regarding his ongoing pain" with plaintiff in September 2017, including "getting him back into physical therapy to help work on his strength," but Dr. Sorger also agreed with plaintiff's plan to "give it some time to see if it gets better on its own" before obtaining a new x-ray and discussing possible right hip replacement. (Tr. 402). In addition, Dr. Wahlquist "advise[d]" plaintiff to proceed with physical therapy in September 2018 (Tr. 620) and noted in August 2018 that plaintiff did not perform "recommended HEP" (Tr. 615), which indicates these were only recommended treatment options.

Moreover, the record shows that the ALJ did not consider whether plaintiff had valid reasons for choosing not to follow these recommendations and to pursue other treatment options. Plaintiff apparently stopped participating in physical therapy post-surgery due to pain (Tr. 32, citing Tr. 402); plaintiff did not have additional physical therapy after the initial sessions because he "failed to see significant improvement in his symptoms" following surgery (Tr. 309); and plaintiff attended some physical therapy sessions in October-November 2018 but stopped going

for unexplained reasons. Further, although plaintiff did not participate in physical therapy and perform recommended home exercises, he walked and performed stretching exercises (Tr. 615); he continued to pursue numerous other types of treatment for continued bilateral hip and shoulder pain and symptoms; and he was referred to specialists and to pain management physicians for consideration of surgical and other treatment options. It was improper for the ALJ to discount plaintiff's subjective allegations based on his alleged noncompliance with physical therapy and home exercise program recommendations without considering plaintiff's continued pursuit of treatment for his bilateral hip and shoulder symptoms and the reasons plaintiff opted to forego certain treatment recommendations in favor of others.

Third, plaintiff alleges that the ALJ erred by finding that his ability to cut grass with a riding mower suggested that he had "an ongoing ability to perform sedentary exertional activity." (Doc. 16 at PAGEID 710). Plaintiff contends that he admittedly is able to sit for limited periods of time, which is not inconsistent with an ability to "mow grass with a riding lawnmower." (*Id*., citing Tr. 302, 52-53).

"Although the ability to do household chores is not direct evidence of an ability to do gainful work" under 20 C.F.R. § 404.1572, "[a]n ALJ may . . . consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments." *Keeton v. Commr. of Soc. Sec*., 583 F. App'x 515, 532 (6th Cir. 2014) (quoting *Walters v. Comm'r of Soc. Sec*., 127 F.3d 525, 532 (6th Cir. 1997)). Here, the ALJ found that although September and October 2018 therapy notes "show increased pain with activity," the same records showed that plaintiff "was able to mow his yard on a riding mower" and thus suggested

an "ongoing ability to perform sedentary exertional activity." (Tr. 33). However, the records do not include any details about this activity, such as how long it took plaintiff to cut the grass or the size of the area he mowed, that would shed any light on plaintiff's ability to perform sustained, gainful sedentary work activity. *See* SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996) ("Ordinarily, [RFC] is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."). Further, plaintiff reported that his mowing activity "increased his hip pain." (Tr. 302). Thus, it is not clear from the record how plaintiff's ability to cut the grass with a riding mower is consistent with the ability to perform sustained sedentary work activity. Absent any additional details, plaintiff's ability to cut the grass using a riding mower does not support the ALJ's finding that plaintiff's subjective allegations were not fully consistent with an inability to perform sedentary work activity.

The ALJ did not properly evaluate plaintiff's subjective complaints in accordance with 20 C.F.R. § 405.1529(c) and SSR 16-3p. Plaintiff's first assignment of error is sustained.

## III. This matter is reversed and remanded for further proceedings

If the ALJ failed to apply the correct legal standards or her factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits. Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan,* 501 U.S. 89, 99 (1991). Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to

consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). Remand for payment of benefits is warranted only "where proof of the disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Id*.

This matter will be reversed and remanded pursuant to sentence four of § 405(g) for further proceedings consistent with this Order. All essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits. *See Faucher,* 17 F.3d at 176. This matter will be remanded for reevaluation of plaintiff's subjective statements and consideration of additional medical and vocational evidence as warranted.

**IT IS THEREFORE ORDERED THAT**:

The decision of the Commissioner is **REVERSED** and **REMANDED** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

Date:  7/16/2021

Karen L. Litkovitz
United States Magistrate Judge